FILED
United States Court of Appeals
Tenth Circuit

December 19, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

GERALD WAYNE SNOW, SR., a/k/a
Gerald Snow,

     Defendant-Appellant.

No. 10-7096

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:09-CR-00081-JHP-1)**

Fred Randolph Lynn, Tulsa, Oklahoma, for Defendant-Appellant.

Christopher J. Wilson, Assistant U.S. Attorney (Sanford C. Coats, United States
Attorney, and Linda A. Epperley, Assistant United States Attorney, with him on
the briefs), Muskogee, Oklahoma, for Plaintiff-Appellee.

Before **O'BRIEN,** Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**HOLMES**, Circuit Judge.

**BRORBY**, Senior Circuit Judge.

Appellant Gerald Wayne Snow, Sr., pled guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and four counts of wire fraud, in violation of 18 U.S.C. §§ 2 and 1343. The district court sentenced him to concurrent ninety-month sentences on each count. Mr. Snow now appeals the district court's sentences, contending it erred in the methodology it used in calculating the reasonable estimate of victim loss attributable to him. He also appeals his sentences on grounds the district court erred in imposing two-level enhancements for his leadership role in the fraud scheme he perpetrated and use of a sophisticated means in carrying out that scheme. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm his sentences.

## I. Background

An investigation revealed that from April 2003 to February 2007 Mr. Snow – a self-employed homebuilder – spearheaded an interstate wire mortgage-fraud scheme in Coweta, Oklahoma, involving approximately forty-four home sales and millions in losses to several financial institutions. Of the over forty homes procured with fraudulently-obtained loans, at least twenty-nine were foreclosed on at a loss to the mortgage holders, another two were sold at a loss to the mortgage holders, and another was destroyed in a fire. While we need not

recount the entire mortgage-fraud scheme involved, an overview of the scheme as follows is necessary for the purpose of addressing the issues raised on appeal.[1]

Mr. Snow, through his company Storybook Homes, Inc., together with his son, Jerry Snow and his companies Snow Homes and C&J Homes, built houses in three subdivisions on land owned by Mr. Snow. Together with two other conspirators who acted as loan originators or brokers, Mr. Snow and his son recruited home buyers to purchase houses for artificially-high prices. To insure the buyers would qualify for loans on these homes, they offered to pay the buyers' down payments and closing costs and promised to provide cash back to the buyers after closing and pay off some of their outstanding debts.

---

[1] Through counsel, Mr. Snow recites numerous facts in his opening brief on appeal but fails on multiple occasions to cite to the record in support of such facts, as required under Federal Rule of Appellate Procedure 28 and Tenth Circuit Rules 28.1 and 28.2. We remind counsel of his responsibility to provide the applicable and correct record references in support of his appellate brief. *See generally United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997) (explaining court will not sift through the record in absence of essential references to the record in a party's brief); *United States v. Easter*, 981 F.2d 1549, 1555 n.4 (10th Cir. 1992) (stating we generally will not consider factual allegations and arguments unsupported by citation to the record). In this instance, we are able to rely on the government's brief and readily review the record to ascertain support for such facts. However, counsel for Mr. Snow is strongly reminded of his responsibility to provide record references in future filings before this court and cautioned failure to do so will result in our declining to consider factual allegations unsupported by reference to the record.

In multiple instances, Mr. Snow or his company, Storybook Homes, did in fact provide the buyers' down payments and/or closing costs, as well as pay off some of their debt, for the purpose of ensuring they qualified for the loans for which they applied. As part of the scheme, Mr. Snow also provided a fictitious employment verification letter for at least one buyer, set up sham second mortgages which he told buyers they would never have to repay, and otherwise fabricated and submitted to financial mortgage lenders materially false information and documentation on the buyers' financial status.

Testimony offered during the district court proceeding against Mr. Snow further established he directed buyers to the loan originators involved in the scheme, determined how much cash back each buyer received on homes they purchased from him, directed the loan originators on how to prepare and present fraudulent loan applications, and taught one of the loan originators how to create fictitious second mortgages to increase the borrower's chances of qualifying for a loan by preventing experienced closing agents from discovering their fraudulent scheme. In order to further conceal the scheme, Mr. Snow disbursed funds and issued checks below the currency transaction reporting threshold of $10,000 for the purpose of avoiding detection, procured cashiers' checks to disguise the true source of the buyers' down payments and closing funds, posed as an agent for other construction companies, and otherwise facilitated and concealed the

creation and submission of the false loan applications and supporting documentation. According to his son, Mr. Snow also instructed him to transfer or circulate money between their accounts and/or into the buyers' accounts for the purpose of qualifying them for loans and avoiding detection of their fraudulent scheme.

Mr. Snow and his son also assisted another individual and his wife in forming a home construction business, after which Mr. Snow sold one of their homes through use of a fraudulent HUD settlement statement. Following the property closings involved in their mortgage-fraud scheme, Mr. Snow and his son received the proceeds from the home sales, after which Mr. Snow provided the loan originators their referral bonuses and buyers the cash proceeds as promised.

This complex scheme of inflating the housing sales prices and manipulating the loan process enabled unqualified buyers to obtain loans to purchase homes, after which over thirty buyers who could not make sufficient payments either defaulted on those loans, causing the properties to go into foreclosure, or sold the homes at a loss to the financial institutions holding the mortgages. In all but one instance, the financial institutions which foreclosed on the properties sold them for less than the loan amounts owed. In the other instance, the financial institution holding the mortgage on a property, known as the Archie property, was

unable to sell the property. In each instance at issue in this appeal, the financial institutions lending the money disbursed the loan funds using interstate wire transfers.

In February 2010, following an investigation, a grand jury indicted Mr. Snow for his part in the mortgage-fraud scheme. Ultimately, Mr. Snow pled guilty to a superceding indictment which included one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and four counts of wire fraud, in violation of 18 U.S.C. §§ 2 and 1343. After the district court accepted his guilty plea, a probation officer prepared a presentence report, and then a revised presentence report, calculating his sentence under the 2009 United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").

In the final revised presentence report dated August 9, 2010, the probation officer calculated Mr. Snow's base offense level at 7 under U.S.S.G. § 2B1.1(a)(1). The probation officer then applied an eighteen-level upward enhancement under § 2B1.1(b)(1)(J) because the $2,578,064.87 victim loss attributable to Mr. Snow was more than $2,500,000 but less than $7,000,000. To arrive at the $2,578,064.87 loss figure, the probation officer subtracted the total resale price of the properties after foreclosure from the total amount financed through their loans. However, with respect to the Archie property, which had not

sold, the probation officer subtracted the county assessor's market valuation of $203,333 from the total amount financed of $270,000, to obtain a loss calculation of $66,667.

The probation officer also applied: (1) a two-level increase to the offense level under U.S.S.G. § 2B1.1(b)(2)(A)(I) because the offense involved twelve victim lending institutions; (2) a two-level increase under § 2B1.1(b)(9)(C) because the offense involved sophisticated means for the execution or concealment of the offense; and (3) a two-level increase under § 3B1.1(c) for Mr. Snow being an organizer or leader because he coordinated the mortgage fraud scheme. A total of six level increases to the offense level, together with a decrease of two levels for Mr. Snow's acceptance of responsibility, resulted in a total offense level of 29. A total offense level of 29, together with Mr. Snow's category I criminal history, resulted in a Guidelines range of 87 to 108 months imprisonment.

Mr. Snow objected to the presentence report and revised presentence report, including the loss amount for the unsold Archie property and the two-level enhancements for being an organizer or leader and committing the offense by sophisticated means. With regard to the Archie property, Mr. Snow argued the probation officer erred in subtracting the county assessor's market value from the

mortgage loan amount. Instead, he argued, the loss amount for that property should have been "the difference between the mortgage amount and the price for which it would sell at auction or *on the open market*" but that no such value had been established. Mr. Snow contended he did not command or control anyone else involved in the scheme for the purpose of warranting a two-level increase for being an organizer or leader, nor did he participate in conduct significantly more complex or intricate to warrant a two-level increase for committing an offense by sophisticated means.

After an initial hearing on Mr. Snow's objections, the district court ordered supplemental briefing on how to calculate the loss amount for the Archie property under U.S.S.G. § 2B1.1. To address Mr. Snow's objection to using the assessor's valuation of the Archie property and his request for an open market valuation, the government retained a certified appraiser who appraised the current value of the Archie property at $172,500. This amount, when deducted from the loan amount of $270,000, resulted in a loss calculation of $97,500, rather than the $66,667 loss calculated using the county assessor's valuation to which Mr. Snow objected. Mr. Snow responded with an alternative means for calculating the loss, suggesting the loss amount attributable to him should be based on the amount of money he gained on the transaction because the actual loss could not be reasonably determined. He then argued no loss should be attributable to him for the Archie

property because the government failed to present any evidence on the amount he gained, which he described as warranting a "freebie" on the property.

At sentencing, the district court applied the certified appraiser's $172,500 valuation to the Archie property, together with other revisions to the presentence report, to conclude the total loss amount attributable to Mr. Snow was $2,560,397.87. This resulted in the same eighteen-level enhancement to the base offense level under § 2B1.1(b)(1)(J), as recommended by the probation officer, because the loss attributable to Mr. Snow was still more than $2,500,000 but less than $7,000,000. In applying the certified appraiser's valuation, the district court implicitly rejected Mr. Snow's contention no reasonable loss amount could be calculated for the purpose of alternatively applying his gain on the transaction to calculate any loss attributable to him.

The district court also denied Mr. Snow's objections to the two-level enhancements for being a leader or organizer and using sophisticated means. In applying these enhancements, and after considering the advisory Guidelines and sentencing factors under 18 U.S.C. § 3553(a), the district court imposed concurrent sentences, at the low end of the Guidelines range of 87 to 108 months, of ninety months on each count.

II. Discussion

A. Loss Calculation Methodology

On appeal, Mr. Snow disputes the district court's methodology in using the certified assessor's current market value to calculate the loss attributable to him on the Archie property, claiming the district court should have used his gain as an alternative measure of loss. In so doing, he again claims no fair market value can be determined for the purpose of calculating actual loss.

In addressing this issue, we take instruction from our holdings in *United States v. Washington*, 634 F.3d 1180 (10th Cir.), *cert. denied*, 132 S. Ct. 300 (2011), and *United States v. James*, 592 F.3d 1109 (10th Cir. 2010), which similarly involved mortgage-fraud schemes and loss calculations. In *Washington,* we explained sentences are reviewed "under an abuse of discretion standard for procedural and substantive reasonableness." 634 F.3d at 1184. "Under this standard factual findings regarding loss calculations are reviewed for clear error and loss calculation methodology *de novo*." *Id.*

With respect to the applicable legal principles, Guidelines "§ 2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss" and "[t]he court is instructed to use the greater of actual or intended loss." *Id.* (relying on U.S.S.G. § 2B1.1 cmt. n.3(A)). The "Guidelines define

'actual loss' as 'the reasonably foreseeable pecuniary harm that resulted from the offense.'" *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)(i)). However, as we pointed out in *James*, "[t]he sentencing court need only make a reasonable estimate of the loss." 592 F.3d at 1114 (internal quotation marks omitted). We further explained actual loss should be measured by the net value, not the gross value, of what was taken when the defendant pledged collateral to secure a fraudulent loan. *See id.* As a result, in *Washington* and *James*, we held that "[w]here a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan." *Washington,* 634 F.3d at 1184 (relying on *James*, 592 F.3d at 1114).

However, when no actual sales price is available to calculate loss, the Guidelines permit a district court "to *estimate* loss 'based on *available* information.'" *James*, 592 F.3d at 1116 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). Moreover, the Guidelines recommend such loss be calculated based on fair market value where no sales price is available. *See* § 2B1.1, cmt. n.3(C)(i); *United States v. Messner*, 107 F.3d 1448, 1455-56 (10th Cir. 1997). Only when "the loss is not reasonably determinable" may a court "use the gain that resulted from the fraud as an alternative measure." *Washington*, 634 F.3d at 1184 (relying on U.S.S.G.

-11-

§ 2B1.1 cmt. n.3(B)). "The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." *Id.* (internal quotation marks omitted).

Here, with respect to the sold properties, the district court followed *Washington* and *James* to determine net loss by subtracting the sales price from the outstanding balance on the loan. However, because no actual sales price was available to calculate the loss on the Archie property, the Guidelines allowed the district court to *estimate* the fair market value of the property loss based on the *available* information. In this case, the information available to the district court for calculating the reasonable estimated fair market value included: (1) the county's assessed valuation, to which Mr. Snow objected and is not at issue on appeal; and (2) the certified assessor's current valuation of the property, which the district court used to calculate his sentence under § 2B1.1(b)(1)(J). The government offered this latter valuation after Mr. Snow objected to the county assessor's valuation and requested the district court use "the difference between the mortgage amount and the *price for which it would sell … on the open market*." Absent actual sale of the house, the certified assessor's valuation of the Archie property provided a reasonable estimate of the fair market value of the property at the time of sentencing, which is arguably the equivalent to the "open market"

-12-

value Mr. Snow requested.[2]  In other words, the government met its burden in

providing a reasonable valuation estimate for calculating the actual loss on the

property.  Moreover, given Mr. Snow has not offered any other methodology for

calculating the fair market value or reasonable estimated loss valuation, we

cannot say the district court erred in using the only information available to it in

estimating the loss.  Because the district court was able to reasonably estimate the

fair market value for the loss calculation, we reject Mr. Snow's contention actual

loss could not be reasonably determined for the purpose of alternatively using his

gain on sale of the property as a measure of loss.  In sum, our *de novo* review

establishes the district court did not err in its methodology in using the certified

assessor's valuation of the Archie property for the purpose of assessing the loss

attributable to Mr. Snow.


## B.  Role and Sophistication Enhancements

Mr. Snow also contends the district court erred in applying two-level

enhancements under § 3B1.1(c) for being an organizer or leader of the mortgage

---

[2]  We reach the merits of this issue even though Mr. Snow's appellate objection to the district court's use of the certified assessor's current market value seemingly appears to contradict his prior request the district court use the "open market" price of the property to determine loss.  As a result, his objection is akin to the "invited error doctrine" which precludes one from arguing the district court erred in adopting a proposition he previously urged the district court to adopt. *See United States v. Quaintance*, 608 F.3d 717, 721 n.2 (10th Cir.), *cert. denied*, 131 S. Ct. 544 (2010); *United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005).

fraud scheme and § 2B1.1(b)(9)(C) for use of sophisticated means to perpetrate

the scheme.  In support, Mr. Snow continues to argue he did not command or

control anyone else involved in the scheme for the purpose of warranting a two-

level increase or participate in conduct significantly more complex or intricate for

the basis of warranting a two-level increase for committing an offense by

sophisticated means.  Instead, he contends he "controlled and led only himself"

and his "offense conduct exhibited no enhanced level of sophistication."


### 1.  Role as Organizer or Leader

We begin with the two-level enhancement for Mr. Snow's role in the

conspiracy and mortgage scheme.  "We review for clear error the district court's

finding that the defendant acted as a leader or organizer for purposes of § 3B1.1."

*James*, 592 F.3d at 1113 (quotation marks omitted).  "Under this standard, we will

not reverse the district court's finding unless, on the entire evidence, we are left

with the definite and firm conviction that a mistake has been committed." *Id.*

(quotation marks omitted).


Guidelines § 3B1.1(c) recommends a two-level increase in a defendant's

offense level if he "was an organizer, leader, manager, or supervisor" in the

criminal activity.  These roles are disjunctive, meaning a defendant need only

qualify for one of these roles to qualify for an increase in his offense level.  *See*

*United States v. Almaraz*, 306 F.3d 1031, 1040, (10th Cir. 2002).  In determining

if a defendant qualifies as an organizer or leader, the Guidelines recommend the

sentencing court consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n.4.  These criteria are advisory, and while Mr. Snow

contends the evidence did not show each of these criteria were met, including

"entitlement to more money than any other participants," it is clear the

commentary criteria are disjunctive, so not all must be met to warrant an increase.


In addition to the criteria cited in the commentary to § 3B1.1, we have held

functioning as a "leader" requires control over underlings, particularly in the form

of recruitment and direction, while no control is necessary to qualify as an

"organizer."  *See United States v. Wardell*, 591 F.3d 1279, 1304 (10th Cir. 2009),

*cert. denied*, 132 S. Ct. 430 (2011).  Instead, to qualify as an "organizer," a

defendant need only devise "a criminal scheme providing the wherewithal to

accomplish the criminal objective, and coordinat[e] and oversee[] the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *Id.*

Here, the district court expressly considered the criteria in application note 4 to Guidelines § 3B1.1 to conclude Mr. Snow qualified as a leader or organizer. In so doing, it found no fraudulent loan transactions or conspiracy would have existed without Mr. Snow's participation. We agree. Our review of the record on appeal, including the entirety of the transcripts provided, shows Mr. Snow orchestrated or otherwise directed the mortgage-fraud scheme when he taught his co-conspirators how to conduct and conceal the scheme; inflated the price and negotiated the sale of the houses he built; coached others on how to submit false information and documentation; recruited another homebuilding company for the purpose of furthering the fraudulent scheme; and convinced home buyers to purchase homes for artificially-high prices by promising and then providing them cash after closing and furnishing his own funds to provide them with money for down payments, closing costs, debt payoff, and fraudulent inflation of their bank accounts for the purpose of obtaining loan approvals.

These circumstances establish Mr. Snow was an "organizer" for the purposes of § 3B1.1(c) even if, as he contends, he "controlled and led only

himself" and therefore did not qualify as a "leader." Indeed, Mr. Snow met much of the criteria relied on by the district court in the commentary to U.S.S.G. § 3B1.1 for the purpose of finding him to be an "organizer," including exercise of decision-making authority, direct and active participation in the commission of the offense, and a heightened degree of participation in planning or organizing the offense. Moreover, he provided the wherewithal to accomplish the mortgage-fraud scheme by providing the cash and knowledge needed to perpetrate it and coordinating and overseeing the implementation of the conspiracy, as demonstrated by his involvement in all stages of the scheme. Even if his son met many of these criteria as well, as previously noted more than one person may qualify as an organizer of a criminal conspiracy. Thus, Mr. Snow meets sufficient criteria to qualify him as an "organizer" of the mortgage-fraud scheme for the purpose of warranting a two-level offense enhancement under § 3B1.1(c), and we are not otherwise left with the definite and firm conviction a mistake has been committed for the purpose of reversing the district court's application of the enhancement. As a result, we need not determine if, as Mr. Snow contends, he did not qualify as a "leader" in the scheme perpetrated.

## 2. Sophisticated Means

On appeal, Mr. Snow contests the district court's two-level increase in his offense level under § 2B1.1(b)(9)(C) for conduct through sophisticated means.

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the [G]uidelines to the facts." *United States v. Jones*, 530 F.3d 1292, 1305 (10th Cir. 2008). Guidelines "[§] 2B1.1(b)(9)(C) provides for a two-level increase in the offense level of a defendant '[i]f ... the offense ... involved sophisticated means.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010). Its accompanying commentary explains that "sophisticated means" refers to an "especially complex or especially intricate offense conduct pertaining to the *execution* or *concealment* of an offense." U.S.S.G. § 2B1.1(b)(9)(C) cmt. n.8(B) (emphasis added). We have also held that "[t]he Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather ... the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *Weiss*, 630 F.3d at 1279.

In this case, Mr. Snow did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions. Evidence of the complexity of this scheme is demonstrated, not only by the lengths Mr. Snow took to execute it, but the actions he took to successfully

conceal the scheme from the financial institutions and title companies involved, which included sufficient sophistication in the execution and concealment of the scheme to fool trained and experienced bank and closing personnel into approving over forty fraudulently-obtained home loans. The record is absolutely replete with instances of Mr. Snow successfully executing and concealing the scheme through especially complex conduct, included his providing, and directing others to provide, fraudulent documentation and information sufficient to fool those reviewing it; disbursing, and instructing others to disburse, funds below the currency transaction reporting threshold; procuring, or instructing others to procure, cashiers' checks to disguise the true source of the buyers' down payments; providing down payments, closing funds, and debt reduction for buyers to qualify for loans; circulating, or instructing his son to circulate, funds through his and his son's business and bank accounts to avoid detection; and teaching a loan originator how to create fictitious second mortgages to help qualify buyers and fool the title and financial institutions involved.

For these reasons, the district court did not commit clear error in its factual findings nor err in its deferential application of § 2B1.1(b)(9)(C) to the facts in this case. Instead, it reasonably applied a two-level increase in Mr. Snow's

offense level under § 2B1.1(b)(9)(C) for conduct by sophisticated means, which involved especially complex conduct in the scheme's execution as well as its concealment. *See* § 2B1.1(b)(9)(C) cmt. n.8(B).

## III.  Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Snow's sentences.