**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 11-4283**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRYAN KEITH NOEL,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Western
District of North Carolina, at Asheville.   Richard L. Voorhees,
District Judge.  (1:09-cr-00057-RLV-1)

_____

Argued:  October 24, 2012          Decided:  December 28, 2012

_____

Before DAVIS and FLOYD, Circuit Judges, and Catherine C. EAGLES,
United States District Judge for the Middle District of North
Carolina, sitting by designation.

_____

Affirmed  by  unpublished  opinion.    Judge  Eagles  wrote  the
opinion, in which Judge Davis and Judge Floyd joined.

_____

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH
CAROLINA,  INC.,  Charlotte,  North  Carolina,  for  Appellant.
Melissa Louise Rikard, OFFICE OF THE UNITED STATES ATTORNEY,
Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Henderson
Hill,  Executive  Director,  FEDERAL  DEFENDERS  OF  WESTERN  NORTH
CAROLINA,  INC.,  Charlotte,  North  Carolina,  Matthew  Segal,
Allison Wexler, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA,
INC.,  Asheville,  North  Carolina,  for  Appellant.    Anne  M.

Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

EAGLES, District Judge:

A jury convicted Bryan Keith Noel of conspiracy to commit mail fraud, multiple counts of mail fraud, conspiracy to commit money laundering, money laundering, multiple counts of bank fraud, multiple counts of making false statements to a bank, and making a false oath in a bankruptcy proceeding. J.A. 2192-93, 2460. Noel was sentenced to 300 months' imprisonment. J.A. 2453, 2461. On appeal, Noel challenges two evidentiary rulings, the propriety of the prosecutor's remarks during closing arguments, and a sentencing enhancement. Finding no reversible error, we affirm.

I.

A.

Noel's convictions in large part stem from an investment fraud scheme. The government alleged that, between 2003 and 2006, Noel recruited retirees to invest more than $10 million with his estate planning company, Certified Estate Planners ("CEP"), by assuring them that their funds would be invested in small-cap stocks and that the investments were low-risk. J.A. 252-54, 372.

Although Noel consistently provided the investors with quarterly statements indicating favorable returns, J.A. 281-82, 333-40, 376-77, 420-23, 650-52, 654-58, 744-45, 751, their

3

investments were generally unsuccessful. J.A. 985. In early 2002, Noel agreed to offer a stock trading program developed by Alexander Klosek, who was employed by CEP as an independent trustee and accountant. J.A. 817, 820, 828-30. The program went well for several months, but it began sustaining substantial losses by June 2002. J.A. 842. Klosek did not tell Noel about the losses. J.A. 842-44, 853-60.

In 2003, Noel began borrowing money from CEP's investor funds to pay for his start-up mining business, including $2 million to purchase a factory in Tennessee. J.A. 861-65, 872. Noel and Klosek agreed to conceal the loan from the investors. J.A. 875, 879-80, 915-16, 934, 1168. Noel continued to borrow money from CEP to fund his start-up companies until 2006, totaling an additional $2 million. J.A. 467, 474, 889, 903-04, 906-07, 912-13, 1360-63, 2270-74. In 2005, Klosek told Noel about the losses sustained as a result of the stock trading program. J.A. 985-91. Noel continued to issue positive quarterly statements. J.A. 333, 337, 423, 893-96, 1718-19, 2223.

Of the over $10 million invested by CEP clients, approximately $2 million were lost in stock market trades and more than $4 million were diverted to Noel's start-ups before CEP's collapse in August 2006. J.A. 1348, 1369, 1406, 1979,

4

2267, 2275, 2359. When the government seized CEP's accounts in August 2006, only $997,630.20 remained. J.A. 1375.

B.

Noel's bank fraud convictions arose from Noel's fraudulent statements on two loan applications. In late 2005, one of Noel's start-up companies applied for and received a $1.25 million loan from Carolina First Bank. J.A. 1001, 1474-75, 1479, 1504, 1805, 1826. The stated purposes of the loan were to repay an earlier loan from Carolina First and to purchase equipment. J.A. 1475, 1479, 1504, 1805, 1826. Noel signed the loan on behalf of his start-up. J.A. 1504. Noel and Klosek actually invested the money in the stock market, hoping to make enough to repay CEP for the funds Noel had routed to his start-ups. J.A. 1001-15, 1453. The investments were unsuccessful, and Noel again sustained substantial losses. J.A. 1006-07, 1018-20, 1196, 1970-74, 2368.

In August 2006, Noel sought to refinance his home. J.A. 1511-12. In his loan application, Noel falsely stated that he was not a defendant to any lawsuit. J.A. 1322, 1381-82. Noel also certified that his income was $23,000 per month. J.A. 1517, 1530, 1538, 1993-97. However, on his later-filed bankruptcy petition, Noel reported his 2006 income as $150,000; on his 2006 tax return, he reported $154,783. J.A. 1447, 1993-97.

5

C.

Noel's bankruptcy fraud convictions stemmed from false statements he made on his August 2007 bankruptcy petition. Despite owning a 2007 BMW with a purchase price of $72,890 and a $1000 assault rifle, Noel listed only a 1997 Ford truck valued at $3500 and only $100 in sporting goods. J.A. 1631-34, 1654, 1683, 1685-86, 1688.

II.

On appeal, Noel first contends that the district court erred in admitting testimony from four CEP investors about the effects of their financial losses, rendering his trial fundamentally unfair under the Due Process Clause of the Fifth Amendment. The victims testified over defense objections that after losing the money they invested with CEP, they could not pay off their mortgages, had to sell their homes, and had to work despite having saved for retirement. J.A. 283-84, 388-89, 638-39. The government's final witness, Carol Odegaard, testified in tears that she almost lost her home, became depressed, had thoughts of suicide, and could not afford her medication. J.A. 1720-21.

We review preserved evidentiary rulings for abuse of discretion and will only reverse a ruling that is "arbitrary and irrational." United States v. Cloud, 680 F.3d 396, 401 (4th

6

Cir. 2012) (internal quotation marks omitted). Under Rule 52(a) of the Federal Rules of Criminal Procedure, evidentiary rulings are subject to harmless error review, "such that 'in order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)).

The testimony about the victims' financial losses was relevant to prove intent to defraud. Cloud, 680 F.3d at 402; see also United States v. Copple, 24 F.3d 535, 545 (3d Cir. 1994) ("Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent. Proof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent." (internal citations omitted)). Even Odegaard's testimony about her mental health was offered in the context of explaining the financial consequences of the fraud and her inability to pay for her prescription medicine. This testimony was extremely brief and was followed by a cautionary instruction not to be swayed by sympathy or pity.

Even assuming that the district court erred in admitting Odegaard's testimony, the error was harmless and did not rise to the level of a due process violation. The jury heard extensive testimony from Klosek that Noel planned and executed a scheme to defraud the investors. Several victims testified as to what Noel said would be done with their money and what actually happened to it. The government presented documentary evidence of the losses contrasted with letters in which Noel assured CEP clients that their investments were thriving. The brief victim-impact testimony "was therefore cumulative and did not have a substantial or injurious effect on the jury's verdict." United States v. DeLeon, 678 F.3d 317, 328 (4th Cir. 2012). Additionally, Noel was acquitted on one charge, indicating the jury was not unfairly influenced by passion or sympathy. Thus, we are confident that the jury's guilty verdicts were not attributable to any error in admitting the victim-impact testimony. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993).

III.

Noel also argues that the district court erred in admitting Klosek's testimony because Klosek was taking anti-anxiety medication. Noel contends that the testimony violated the Sixth Amendment's Confrontation Clause because the medication acted as

8

a "screen" that deprived Noel of a meaningful opportunity for confrontation and cross-examination.

Because defense counsel did not object at trial with a reasonable degree of specificity as to the Confrontation Clause violation, objecting instead on competency grounds, this claim is subject to plain error review. See Fed. R. Evid. 103(a); United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983) ("The mandate for specificity in the Rule imposes upon the objecting party the obligation to object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection; and would have clearly stated the specific ground now asserted on appeal." (internal quotation marks, citations, and alteration omitted)). Accordingly, we will reverse only if Noel demonstrates error that was plain and affected his substantial rights. United States v. Mackins, 315 F.3d 399, 408 (4th Cir. 2003).

The Confrontation Clause protects a defendant's right to face witnesses who testify against him and his right to conduct cross-examination. See Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); United States v. Jinwright, 683 F.3d 471, 482-83 (4th Cir. 2012). There is nothing in the record to indicate that Klosek's medication had the effect of "screening" Klosek from Noel. See Coy v. Iowa, 487 U.S. 1012, 1020-21 (1988) (holding that a witness's testimony, given from behind a screen designed

9

to block the witness's view of the defendant, violated the defendant's right to a face-to-face encounter). Further, Noel was given a full and complete opportunity to cross-examine Klosek in front of the jury, including questions about his mental health and the effects of his medication. Accordingly, we hold that the district court did not err in permitting Klosek to testify.

IV.

Noel next challenges the government's closing argument. Specifically, Noel objects to what he characterizes as the prosecutor's (1) call for justice; (2) comparison of Noel to the victims; and (3) call for the jury to "do the right thing."

In the government's closing argument, after summarizing the fraud schemes, counsel closed with the following:

> While John Thomas worked for years as a lineman in the Wisconsin winters and the hot Midwest summers saving up so he and his wife could hike and travel in the final years of their retirement, it took Mr. Noel one seminar, one meeting, one wire transfer, and one big lie to take half of it away and to buy himself a factory . . . .

> While Ms. O'Ryan worked hard as a single mom and as a teacher saving up so her daughter could go to medical school Mr. Noel had other ideas for her money. She never even heard of [Noel's start-up companies] until it was too late.

> While Mr. Emme and his wife lived under their means for 30 plus years saving up for retirement Mr. Noel was using their money to buy a factory . . . , to

10

fund [one of his start-ups], buying five BMWs in five years, refinancing his million-dollar home, and hiding his $73,000 BMW, his expensive firearm, and $200,000 in income from the federal bankruptcy court.

It's been an endless stream of lies, members of the jury. But now it is time for the truth. It is time for you to hold Mr. Noel accountable. It is time for you to give these people justice. It is time to find the truth. It is time to find him guilty.

J.A. 2093-94. During the government's rebuttal, counsel stated

We're asking for it to finish right. These people were wronged. They were lied to repeatedly. They were defrauded. They were subjected to a scheme to defraud, as was the bankruptcy court, as was JP Morgan Bank, as was Carolina First Bank, and what we are asking you to do is to end it right, to finish it right, to do the right thing.

J.A. 2134.

Because Noel did not object to the prosecutor's remarks, we review this claim for plain error. See United States v. Loayza, 107 F.3d 257, 262 (4th Cir. 1997).

"[P]rosecutors enjoy considerable latitude in presenting arguments to a jury because the adversary system permits the prosecutor to prosecute with earnestness and vigor." Bates v. Lee, 308 F.3d 411, 422 (4th Cir. 2002) (internal quotation marks and citations omitted). A prosecutor's remarks may violate a defendant's due process rights, however, if the remarks were (1) improper; and (2) so prejudiced the defendant's substantial rights that he was denied a fair trial. United States v.

11

Wilson, 624 F.3d 640, 656 (4th Cir. 2010). In assessing prejudice, we consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

Id. at 656-57.

The prosecutor's comments were not improper and did not deny Noel a fair trial. When a crime has a victim, it is not improper to point that out to the jury. The argument accurately summarized the evidence presented at trial and placed Noel's conduct in context. Moreover, the government presented strong evidence of Noel's guilt, and the court had already instructed the jury to resist being swayed by sympathy for the victims.

Having found no reversible error in the admission of evidence or the government's closing argument, we also reject Noel's proposition that, combined, the victim-impact testimony and the government's closing argument warrant reversal pursuant to the cumulative error doctrine. Faced with strong evidence against Noel and a fundamentally fair trial, we conclude that cumulatively there is no error.

12

V.

Finally, Noel claims that the district court committed procedural sentencing error by imposing a two-level sophisticated means enhancement pursuant to U.S. Sentencing Guidelines Manual ("USSG") § 2B1.1(b)(9)(C) (2009), and a two-level sophisticated laundering enhancement, pursuant to USSG § 2S1.1(b)(3).  In reviewing a district court's guidelines calculation, "including its application of any sentencing enhancements, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error." United States v. Horton, 693 F.3d 463, 474 (4th Cir. 2012).  We thus review for clear error the district court's finding that Noel used sophisticated means.

Section 2B1.1(b)(9)(C) of the 2009 guidelines provides for a two-level sentencing enhancement if the offense "involved sophisticated means," which is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  USSG § 2B1.1 cmt. n.8(B). Likewise, USSG § 2S1.1(b)(3) applies a two-level enhancement where a money laundering offense "involved sophisticated laundering," similarly defined as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense."  USSG § 2S1.1 cmt. n.5(A).

13

Noel essentially argues that his conduct was not intricate or complex enough to warrant sophistication enhancements because he did not use fictitious entities, shell corporations, or offshore accounts. However, each of a defendant's individual actions need not be sophisticated to warrant a sophisticated means enhancement. See Jinwright, 683 F.3d at 486 (applying USSG § 2T1.1(b)(2) tax fraud sophisticated means enhancement); United States v. Snow, 663 F.3d 1156, 1163-64 (10th Cir. 2011) (applying USSG § 2B1.1(b)(9)(C)); United States v. Ghertler, 605 F.3d 1256, 1267-68 (11th Cir. 2010) (same); United States v. Wayland, 549 F.3d 526, 529 (7th Cir. 2008) (same).

The district court found application of § 2B1.1(b)(9)(C) and § 2S1.1(b)(3) was appropriate in light of the "intricate web of representations and manipulations and maneuverings" Noel created to hide the scheme from his investors. J.A. 2398. This finding was supported by substantial evidence. Over a three-year period, Noel attracted CEP clients by assuring them that he would invest their money safely and took money from those investors to fund his own start-up companies. Meanwhile, Noel intentionally informed the investors through quarterly statements and letters, as well as in person, that their money was producing well, and Noel instructed Klosek to do the same. Noel also lied to two financial institutions in order to perpetuate and obscure the scheme. Noel's three-year period of

14

extensive, intentional concealment is the kind of scheme anticipated by the enhancements. <u>See, e.g.</u>, <u>United States v. Sheneman</u>, 682 F.3d 623, 631-32 (7th Cir. 2012); <u>Snow</u>, 663 F.3d at 1164; <u>United States v. Fiorito</u>, 640 F.3d 338, 351 (8th Cir. 2011). Thus, we conclude that the district court did not err in applying sophisticated means and laundering enhancements.

## VI.

For the reasons stated, we affirm Noel's conviction and sentence.

<u>AFFIRMED</u>

15