23-6909-cr

United States Court of Appeals

For the Second Circuit

---

August Term 2024

Argued: November 1, 2024

Decided: June 27, 2025

No. 23-6909-cr

---

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

GEORGE GULDI,

*Defendant-Appellant.*[*]

---

Appeal from the United States District Court

for the Southern District of New York

No. 19-cr-126

Alvin K. Hellerstein, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

Before:        PARK, ROBINSON, and PÉREZ, *Circuit Judge*s.

Defendant-Appellant George Guldi worked with his former girlfriend Victoria Davidson to persuade a mortgage servicer to wire her $253,236 that did not belong to either of them.  A jury convicted Guldi of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud.  He was sentenced to 36 months of imprisonment followed by three years of supervised release.

We affirm Guldi's convictions in most respects.  First, when viewed in the light most favorable to the government, sufficient evidence supports the jury's findings on the existence of a conspiracy, fraudulent intent, and aiding and abetting.  Second, the district court committed no reversible error in its jury instructions on conspiracy, wire fraud, and fraudulent intent.  Third, the district court properly considered Guldi's medical needs during sentencing.

However, we conclude that Guldi's conduct did not warrant a two-offense-level enhancement under the U.S. Sentencing Guidelines for using "sophisticated means" to commit or conceal the offense.  The district court committed procedural error by applying that enhancement, and because we cannot say that error was harmless, Guldi's sentence is procedurally unreasonable.

Therefore, we **AFFIRM** the judgment of conviction except as to Guldi's sentence, which we **VACATE** and **REMAND** for resentencing consistent with this opinion.

Judge Park concurs in part and dissents in part in a separate opinion.

————

DANIEL C. RICHENTHAL (Jonathan L. Bodansky, Madison Reddick Smyser, Karl Metzner, *on the brief*), Assistant United States Attorneys, *for* DAMIAN WILLIAMS, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

ALLEGRA GLASHAUSSER, Of Counsel, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

————

MYRNA PÉREZ, *Circuit Judge*:

Defendant-Appellant George Guldi worked with his former girlfriend Victoria Davidson to persuade a mortgage servicer to wire her $253,236 that did not belong to either of them. A jury convicted Guldi of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud. He was sentenced to 36 months of imprisonment followed by three years of supervised release.

We affirm Guldi's convictions in most respects. First, when viewed in the light most favorable to the government, sufficient evidence supports the jury's findings on the existence of a conspiracy, fraudulent intent, and aiding and

3

abetting. Second, the district court committed no reversible error in its jury instructions on conspiracy, wire fraud, and fraudulent intent. Third, the district court properly considered Guldi's medical needs during sentencing.

However, we conclude that Guldi's conduct did not warrant a two-offense-level enhancement under the U.S. Sentencing Guidelines for using "sophisticated means" to commit or conceal the offense. The district court committed procedural error by applying that enhancement, and because we cannot say that error was harmless, Guldi's sentence is procedurally unreasonable.

## I. BACKGROUND

A.   Factual Background

George Guldi is a former Suffolk County legislator and a disbarred real estate attorney. In 2017, he and his former girlfriend, Victoria Davidson, deceived mortgage servicer Ditech Financial LLC ("Ditech") into wiring them $253,236. But the origins of this fraud trace back to 2008.

1.   *The 2008 House Fire and Guldi's Prior Convictions*

In November 2008, Guldi's home in Suffolk County, New York, burned down in a fire. Guldi's insurance company sent him a check for $863,473.30 made out to both Guldi and his mortgage servicer, Countrywide Home Loans

4

("Countrywide"). Guldi's insurance policy required him to use the money to rebuild the home or repay the outstanding mortgage. But Guldi did neither. Instead, he forged an endorsement from Countrywide and deposited the check into his bank account at JPMorgan Chase Bank, N.A. ("Chase").

In 2011, Guldi was convicted in Suffolk County Supreme Court of grand larceny and insurance fraud in connection with his misuse of the insurance check. After that conviction was reversed on appeal, he pled guilty to grand larceny in 2017. Also in 2011, Guldi was convicted in a separate case in Suffolk County Supreme Court for an unrelated mortgage-fraud scheme. In that case, he pled guilty to 23 counts of grand larceny in the first degree, 11 counts of grand larceny in the second degree, and one count of a scheme to defraud in the first degree. Guldi was sentenced to a term of incarceration and disbarred from the practice of law.

2.      *The 2014 Civil Lawsuit and $253,236 Settlement Check*

In 2014, Countrywide and its parent, Bank of America, sued Chase for improperly allowing Guldi to deposit the $863,473.30 insurance check. Ditech, a sub-servicer of the mortgage on Guldi's Suffolk County home, was also a party to

5

the lawsuit. The parties settled in late 2016. As part of that settlement, Chase sent a check for $253,236 to Ditech.

Ditech mistakenly treated the check as a payment from Guldi toward his mortgage loan on the property, rather than a settlement check from Chase. Ditech informed Guldi by letter in March 2017—when Guldi was incarcerated at Marcy Correctional Facility in upstate New York—that although Ditech had received a payment of $253,236 toward his mortgage, it was not enough to pay off the amount Guldi owed. The letter provided a phone number at which Guldi could reach Ditech.

3. *The 2017 Fraud Scheme*

Guldi did not know about the 2016 settlement when he received Ditech's letter. But he knew that he had not made any payments to Ditech. He guessed that the district attorney had seized funds from his Chase account and sent the funds to Ditech. Shortly after receiving the letter, Guldi called Davidson.

On a recorded call from prison, Guldi arranged with Davidson for her to call Ditech on his behalf. Guldi promised to pay Davidson $25,000—about ten percent of the total—if she could "break it loose." App'x at 290. When Davidson asked Guldi how she should approach the call, Guldi answered: "You can do

6

whatever you want. This is information I'm giving you to use as you will." *Id.* at 292. When Davidson floated the idea that she could tell Ditech that the money was sent by mistake, Guldi told her to "go with what works." *Id.*

The next day, Davidson called Ditech and requested the "return[]" of the $253,236. Supp. App'x at 2–4. But customer service representatives would not speak to her without Guldi's authorization. When Davidson informed Guldi that she needed an authorization letter from him, Guldi hesitated, telling her he was not prepared to provide one.

Davidson then forged an authorization letter from Guldi dated April 3, 2015, and sent it to Ditech. The letter purported to give Davidson "full authority to manage the return" of the funds and directed Ditech to wire the money to Davidson's personal bank account. Supp. App'x at 190. Upon receiving the letter, Ditech representatives began speaking with Davidson. She told Ditech that she and Guldi had sent the money by mistake, that the payment was in the wrong amount and had been intended for another recipient, that she and Guldi were working to resolve the full balance of the mortgage, that Davidson was an attorney prepared to take legal action, and that Davidson was an officer of Guldi's companies. Those statements were all false.

7

During this time, Guldi still did not know that Davidson had forged an authorization letter. In fact, on April 14, 2017, Guldi called Davidson and told her he no longer wanted her help in getting the money from Ditech. Davidson asked him to reconsider and to make her his representative. She proposed an in-person meeting to continue the conversation, and Guldi agreed.

On April 16, 2017, Davidson visited Guldi in prison. That meeting, unlike their phone calls, was not recorded. But in a recorded call the next day, Guldi offered to double Davidson's share of the Ditech money from ten percent to twenty, or $50,000. He also began instructing her to write bank checks and to pay down his various debts if she obtained the money.

Over the next several days, Davidson called Ditech several times. On April 20, 2017, Ditech wired $253,236 to Davidson's personal account at Wells Fargo, taking her balance from negative $115 to positive $253,121.

Davidson did not immediately tell Guldi that she had obtained the funds. Instead, she began to spend the money, making out checks to towns where Guldi owed property taxes and to her own student loan account. It was not until May 1, 2017—when Davidson's balance was down to $69,960.13—that she finally told Guldi that she had received the money.

8

When Davidson shared the "good news," Guldi responded, "we're gonna have some real fun with this." App'x at 350. Davidson shared that she was a "little nervous," and Guldi warned her, "[w]ires can be reversed" and "bounced out of your account." *Id.* He made a "strong suggestion" that Davidson "[r]oll virtually all of it down into bank checks, whether [she was] gonna use them or not, so it's not laying in" her account. *Id.* at 354. He also suggested that she "might want to reduce some of it to cash" but "never take ten at a time," "take nine, because there's additional reporting . . . on ten." *Id.* at 355. Guldi also instructed Davidson on how to spend the money, including paying his mortgages, child support, and tax obligations.

The next day, Davidson purchased a cashier's check made out to herself. When she needed money, she cashed the cashier's check, took what she needed, and used the remaining funds to purchase a new cashier's check. Over the next six weeks, Davidson paid Guldi's debts and child support obligations. She also took a trip to Italy and purchased horseback-riding equipment. By July 11, 2017, her bank account balance was negative again.

Just as Guldi and Davidson exhausted the ill-gotten funds, Ditech uncovered its mistake. Ditech realized that Guldi and Davidson had not actually

sent the $253,236 by mistake. In August 2017, Ditech requested that Guldi and Davidson return the funds, which they did not do.

B.      Procedural History

Guldi and Davidson went to trial on five counts. Count One charged them both with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349. Counts Two and Three charged them each, respectively, with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. And Counts Four and Five charged them each, respectively, with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2.

After a two-week trial from January 10 to 25, 2023, the jury convicted Guldi on each of the three counts with which he was charged. On August 1, 2023, the district court sentenced Guldi to a term of 36 months of imprisonment to be followed by three years of supervised release. The district court also imposed a mandatory special assessment of $300, ordered Guldi to forfeit $253,236, and ordered him to pay $358,556 in restitution.

## II. DISCUSSION

On appeal, Guldi argues that the jury's verdict was not supported by sufficient evidence, that the district court improperly instructed the jury, and that the district court erred in imposing a sentence of 36 months' imprisonment. We

10

agree that Guldi's sentence is procedurally unreasonable only insofar as the district court erred in applying the two-offense-level enhancement under the U.S. Sentencing Guidelines for using "sophisticated means" in committing or concealing the offense, so we vacate Guldi's sentence and remand for resentencing. We affirm Guldi's conviction in all other respects.

## A.    Sufficiency of the Evidence

Guldi cannot meet the heavy burden required to challenge the sufficiency of the evidence that he reached an agreement with Davidson to commit fraud, had fraudulent intent, and aided or abetted Davidson in committing fraud. A rational trier of fact could have found Guldi guilty beyond a reasonable doubt.

### 1.    *Legal Standards*

"We review de novo challenges to the sufficiency of the evidence." *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010) (citing *United States v. Abdulle*, 564 F.3d 119, 125 (2d Cir. 2009)). In reviewing such a claim, "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* (quoting *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007)). A jury verdict must be upheld if "*any* rational trier of fact could have found the

11

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 319 (1979) (emphasis in original). The standard of review is "exceedingly

deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008), and "[a]

defendant challenging the sufficiency of the evidence bears a heavy burden,"

*United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). But the defendant's burden

is not insurmountable, and our deference is not absolute. "If the evidence viewed

in the light most favorable to the prosecution gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence, then a

reasonable jury must necessarily entertain a reasonable doubt." *United States v.*

*Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) (quoting *United States v. Hawkins*, 547

F.3d 66, 71 (2d Cir. 2008)).

Deference to the jury is "especially important" in the context of conspiracy

convictions, as "a conspiracy by its very nature is a secretive operation, and it is a

rare case where all aspects of a conspiracy can be laid bare in court with the

precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.

2003) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). "[A]

defendant's knowledge of the conspiracy and his participation in it with criminal

intent," for example, "may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993).

2.    *Application*

There is sufficient evidence from which a rational jury could have found that Guldi entered into a conspiracy with Davidson. "A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance," from "a lack of surprise when discussing the conspiracy with others," or from "evidence that the defendant participated in conversations directly related to the substance of the conspiracy . . . or received or expected to receive a share of the profits from the conspiracy." *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) (citations omitted).

Guldi and Davidson planned together to try to obtain the money from Ditech. Guldi first offered Davidson ten percent of the proceeds if she could "break [the funds] loose" by doing "whatever" she wanted. App'x at 290, 292. Even though Guldi at first did not provide the authorization letter, he later increased Davidson's share to twenty percent, after their in-person meeting on April 16, 2017. When Davidson proposed telling Ditech "this was a mistake, oops

13

. . . we thought it would be enough to just kind of hold things over," Guldi did not object to Davidson lying to Ditech; his only objection was "that won't work," though it ultimately did. *Id.* at 295. And after Davidson obtained the money, Guldi was immediately prepared to have "some real fun." *Id.* at 350. He instructed her on how to spend the money, and they discussed how to prevent the fund transfer from being "reversed" and how to avoid "additional reporting" requirements. *Id.* at 350, 355.

Although Guldi initially hesitated to go along with Davidson's plan to acquire the money, and Davidson took certain steps without Guldi knowing— such as forging the authorization letter—that does not preclude a finding that they agreed to obtain the funds through fraud. "The government need not prove that he knew . . . all the details of [the conspiracy's] operation, so long as it proves that the coconspirators agreed on the essential nature of the plan." *United States v. Miranda-Ortiz*, 926 F.2d 172, 175–76 (2d Cir. 1991) (citations omitted). The evidence here, "viewed deferentially and in the aggregate," was sufficient to conclude that Guldi and Davidson agreed on the essence of the plan: lying to Ditech to obtain the funds. *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002). Guldi's argument

14

that there was insufficient evidence to prove that he conspired with Davidson thus fails.

Similarly, sufficient evidence supports the jury's finding that Guldi acted with fraudulent intent. Guldi argues that he lacked fraudulent intent, and did not agree with Davidson to break the law, because he believed the money was his— i.e., he merely intended to stop the District Attorney's office from taking his money. But even assuming Guldi genuinely believed he was entitled to the $253,236, there is sufficient evidence of fraudulent intent.

"[C]ourts have uniformly held that a claim-of-right is not a defense to mail fraud." *United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998); *see also United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (affirming jury instruction that "no amount of honest belief on the part of a defendant that the scheme will . . . not cause anyone harm[] will excuse fraudulent actions or false representations by him or her" (alteration adopted)). Here, Guldi knew that Davidson had planned to and ultimately had lied to Ditech to induce the fund transfer. For example, when Davidson suggested to Guldi that she would simply lie to Ditech and say they sent the money by mistake, Guldi told her he thought that would not work, and she was "gonna have to take a harder line with them," but he ultimately told her she

15

could "go with what works."  App'x at 292.  Then, when Davidson confirmed to Guldi that she had told Ditech the money was "sent in error" and "the full amount [would] follow," Guldi expressed no surprise or hesitation.  *Id.* at 303.  Even if Guldi believed that the money rightfully belonged to him, he knew Ditech only gave it back to him because they believed a lie, and "a fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses."  *Kousisis v. United States*, 145 S. Ct. 1382, 1394 n.5 (2025); *see id.* (noting that "an 'injury' has occurred" that can support a fraud conviction "when a fraudster 'obtains from an owner . . . property which he would not otherwise have parted with upon the terms which he is thus induced to accept'" (alteration adopted)).[2]

Thus, viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, sufficient evidence underpins the jury's findings here.  While the evidence that Guldi participated in the conspiracy with fraudulent intent is mostly circumstantial, that evidence weighs far more heavily on the side of guilt than innocence, and therefore it is sufficient to sustain Guldi's conviction.  *Cf. Landesman*, 17 F.4th at 320.

---

[2] Guldi's argument that he cannot be guilty under an aiding-and-abetting theory because he lacked intent to defraud fails for the same reasons.

B.    Jury Instructions

The district court also did not commit any error that requires vacatur in instructing the jury. Guldi's challenges to the district court's conspiracy and substantive wire fraud instructions are unpreserved, and Guldi has not identified any plain error in those instructions. Guldi's arguments about the district court's intent instruction were preserved, but his arguments are legally erroneous.

1.    *Legal Standards*

"We review challenges to jury instructions *de novo . . . .*" *United States v. Calk*, 87 F.4th 164, 177 (2d Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024). A jury instruction is "erroneous 'if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (quoting *United States v. Finazzo*, 850 F.3d 94, 105 (2d Cir. 2017), *abrogated on other grounds by*, *Ciminelli v. United States*, 598 U.S. 306 (2023)). "In reviewing a jury instruction, we examine not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Raniere*, 55 F.4th 354, 362 (2d Cir. 2022) (internal quotation marks omitted) (quoting *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir. 2011)). We "revers[e] only where, viewing the

charge as a whole, there was a prejudicial error." *Calk*, 87 F.4th at 177 (quoting

*United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)).

The Federal Rules of Criminal Procedure require that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Where a defendant does "not object to the jury instructions at trial, we review the instructions for plain error." *United States v. Omotayo*, 132 F.4th 181, 195 (2d Cir. 2025); *see* Fed. R. Crim. P. 30(d). "To demonstrate plain error," a defendant "must show (1) error, (2) that was clear and obvious under existing law, *i.e.*, law established at the time of this appeal, (3) that affected his substantial rights, and (4) that cast doubt on the fairness, integrity, or public reputation of judicial proceedings." *United States v. Dennis*, 132 F.4th 214, 235–36 (2d Cir. 2025).

2. *Application*

a. Conspiracy

Guldi's first set of challenges to the jury instructions pertains to the district court's conspiracy instruction. We review this challenge for plain error because at trial, Guldi did not raise either of the two arguments he raises on appeal. At the

18

charging conference, Guldi's only objection was that one portion of the conspiracy charge was "repetitive." App'x at 225. This "falls short because," as discussed below, "it was materially different from the objection[s] raised here." *United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023).

We find no plain error in either of the aspects of the conspiracy instruction to which Guldi objects.

First, the district court did not plainly err in instructing the jury that a "conspirator's liability is not measured by the extent or duration of his or her participation or whether he or she joined at the outset or some later time." App'x at 273. Even though there were only two conspirators, and therefore no conspiracy existed until and unless Guldi and Davidson had both "joined," we conclude that any possible confusion was dispelled by the rest of the instruction. *See United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) ("[T]he crime of conspiracy must involve the agreement of two or more persons to commit a criminal act or acts 'since the act of agreeing is a group act, unless at least two people commit it, no one does.'" (alteration adopted)). The district court repeatedly instructed the jury that the government had to prove "two or more persons made an agreement to violate a particular law," and "[a] conspiracy is a kind of criminal partnership, an

19

agreement of two or more persons to join together to accomplish an unlawful purpose." App'x at 273. Therefore, the instructions were not plainly erroneous when "viewed as a whole." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (quoting *United States v. Binday*, 804 F.3d 558, 581–82 (2d Cir. 2015)).

Second, the district court correctly rejected Guldi's request to instruct the jury that Guldi could be liable for conspiracy only if Davidson's actions in furtherance thereof were foreseeable to him. Guldi relies on *Pinkerton v. United States*, 328 U.S. 640 (1946), in which "the Supreme Court held that a criminal defendant may be liable for a substantive offense—apart from a conspiracy charge—based on the actions of the defendant's co-conspirators." *Gomez v. United States*, 87 F.4th 100, 109 (2d Cir. 2023). It is true that, under *Pinkerton*, one is liable for a co-conspirator's substantive offenses only "if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement." *Id.* (quoting *United States v. McCoy*, 995 F.3d 32, 63 (2d Cir. 2021), *vacated on other grounds*, 142 S. Ct. 2863 (2022)). But, again, *Pinkerton* governs liability for substantive offenses in furtherance of a conspiracy, not for the conspiracy itself. *See, e.g.*, *Gomez*, 87 F.4th at 109 ("[U]nder a *Pinkerton* theory the defendant is convicted of the substantive offense—not of conspiring to commit the offense.").

20

The district court accordingly did not commit plain error in omitting foreseeability from its conspiracy instructions.

> b.      Wire Fraud

Next, Guldi challenges the following passage from the district court's instruction on the substantive offense of wire fraud:

> A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals or makes the goals his own, becomes a member of the scheme and is legally responsible for . . . all that may have been done in the past in furtherance of the criminal objective, and all that is done thereafter.

App'x at 275.  We review this challenge for plain error because Guldi failed to object to this instruction at all at trial.

We find no plain error because, reviewing the district court's instruction as a whole, it adequately conveyed to the jury that, "with regard to *substantive offenses*, a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy." *United States v. Blackmon*, 839 F.2d 900, 909 (2d Cir. 1988) (emphasis in original).  In a scheme to defraud, the relevant substantive offense "is not complete until the proceeds have been received." *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013) (quoting *United States v. Sindona*, 636 F.2d 792, 802 (2d Cir. 1980)).  And shortly after giving the instruction quoted above, the

district court reminded the jury: "All that is important is that the defendant specifically intended to obtain the money or property through fraud or deception, and the government must prove that as to each defendant beyond a reasonable doubt." App'x at 275. If the jury had found that Guldi only joined the scheme to defraud after Davidson had already obtained the money, then the jury could not have found that Guldi had any specific intent about how she did so. Therefore, the instruction "adequately communicated the essential idea[]" that the jury could convict Guldi only if he joined the wire fraud scheme before it was complete. *United States v. Schultz*, 333 F.3d 393, 414 (2d Cir. 2003) (alteration adopted) (quoting *United States v. Velez-Vasquez*, 116 F.3d 58, 61 (2d Cir. 1997)).

*United States v. Blackmon*, on which Guldi relies, is not to the contrary. 839 F.2d 900. While the district court in *Blackmon* gave an instruction similar to the one Guldi objects to here, that is not why we vacated the convictions in *Blackmon*. Rather, this Court held that the district court erred by instructing the jury that it "*must* convict a member of the conspiracy for substantive offenses committed by coconspirators prior to the member's entry into the conspiracy." *Id.* at 909 (emphasis added); *id.* at 908 (quoting the instruction as telling the jury, "as to all defendants who were members of a single scheme *it is your duty to find them guilty*

22

*of all substantive crimes* committed in furtherance of that single scheme whether or not they were directly involved in a particular fraudulent transaction" (emphasis in original)).  The district court here did no such thing.  Accordingly, we find no plain error in the district court's wire fraud instructions.

        c.      Fraudulent Intent

As for the intent necessary to convict Guldi of wire fraud and bank fraud, the district court instructed the jury:  "A person acts with a specific intent to defraud if he or she intends to obtain money or property held by another through a fraudulent or deceptive scheme."  App'x at 275.  The district court added:  "The government need not prove that the deceived person actually was harmed, nor is it relevant if the defendant thought that the money or property really belonged to him or her, or should be paid to him or her, or that the motives were good."  *Id.* But, the court explained, "[i]f the defendant had a good-faith belief that his or her words and actions were truthful and honest, you must acquit that defendant."  *Id.* at 275–76.  As the court instructed, that is because to have intent to defraud, "[t]he defendant must know that his or her words and actions were untrue and deceptive and were used for the specific purpose of obtaining money or property through those untruths and deceptions."  *Id.* at 275.

Guldi argues that these instructions erroneously undermined the "good faith" defense that he intended to assert—i.e., that he was not guilty of fraud because he genuinely believed the money at issue belonged to him, not to Ditech. Guldi preserved this argument at trial by specifically objecting to instructing the jury that his claim of right was not "relevant" and by requesting a broader instruction consistent with his planned "good faith" defense. App'x at 229. Therefore, we review this challenge to the district court's jury instructions de novo.

Even applying the more rigorous standard of review, however, the district court did not err, because as discussed above, "courts have uniformly held that a claim-of-right is not a defense to mail fraud." *Gole*, 158 F.3d at 168; *see also Ferguson*, 676 F.3d at 280. And, as the Supreme Court recently reaffirmed, "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Kousisis*, 145 S. Ct. at 1392. That is, the fraud statutes prohibit schemes to obtain money or property of another through lies, even if the defendant believes the victim owes him money.

As we recognized in *Gole*, if Guldi's "theory of self-help were the law, anyone who believed that he was legally entitled to benefits . . . , but who was

24

concerned that he or she might nevertheless be denied such benefits, would be given carte blanche simply to lie to obtain those benefits." 158 F.3d at 168. While that might "often be much easier than pursuing legal remedies through civil actions in court, and would guarantee success as long as the misrepresentation remained undiscovered," our law does not "encourage people to lie to obtain benefits rather than pursue their rights in civil actions." *Id.* "Such controversies may be resolved by civil suit or settlement, but cannot be won by using lies and deception." *Id.*

Guldi's reliance on *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998), is misplaced, for the same reason this argument failed in *Gole*. In *Rossomando*, the defendant "carelessly filled out" forms seeking pension benefits, but he thought the pension fund "was *never* going to lose money," because he thought any misstatements would be immaterial. *Id.* at 198, 202 (emphasis in original). We held that the district court erred in instructing the jury that "[n]o amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss . . . will excuse fraudulent actions or false representations by him to obtain money," because it allowed the jury "to convict Rossomando of mail fraud without finding that he contemplated harm to the" victim. *Id.* at 199–200.

25

And in *Gole*, we clarified that *Rossomando* did not create a general good faith defense to fraud, but rather "turned on the defendant's knowledge of the immateriality of the false statements he made." *Gole*, 158 F.3d at 168.

At bottom, where a defendant intends to obtain money by lying, it is no defense that he believes his victim owes him money. The district court correctly stated that principle, and thus properly instructed the jury on fraudulent intent.

C.    Sentencing

Turning to the sentencing proceedings, Guldi contends that the district court committed two procedural errors in sentencing him to 36 months' imprisonment. First, we disagree that the district court improperly relied on the government's assertion that the Bureau of Prisons ("BOP") could provide Guldi adequate cancer care. Second, however, we agree that the district court erred in calculating the Guidelines range, by determining that he used "sophisticated means" in the commission or concealment of the offense.

1.    *Legal Standards*

"[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" *Gall v. United States*, 552 U.S. 38, 46 (2007). Reasonableness review has two components: "procedural review and substantive

26

review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). We "review[] criminal sentences 'for procedural and substantive reasonableness under a deferential abuse-of-discretion standard.'" *Hunt*, 82 F.4th at 142 (quoting *United States v. Singh*, 877 F.3d 107, 115 (2d Cir. 2017)). In practice, "the procedural inquiry looks to whether the sentencing judge has properly accounted for the factors that constrain its sentencing discretion; substantive reasonableness examines whether, after accounting for those constraints, the district court's exercise of its discretion can be located within the range of permissible decisions." *United States v. Sims*, 92 F.4th 115, 122 (2d Cir. 2024) (internal quotation marks omitted and alteration adopted) (quoting *United States v. Kunz*, 68 F.4th 748, 759 (2d Cir. 2023)).

"A district court commits procedural error where it fails to calculate the Guidelines range," "makes a mistake in its Guidelines calculation," "treats the Guidelines as mandatory," "does not consider the § 3553(a) factors," "rests its sentence on a clearly erroneous finding of fact," or "fails adequately to explain its chosen sentence" with "an explanation for any deviation from the Guidelines range." *Cavera*, 550 F.3d at 190 (internal quotation marks and citations omitted). "We review a district court's application of the guidelines *de novo*, but factual

determinations are reviewed for clear error." *United States v. Rainford*, 110 F.4th 455, 475 (2d Cir. 2024) (citing *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015)).

"Generally, 'if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, we will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor.'" *United States v. Pope*, 554 F.3d 240, 246–47 (2d Cir. 2009) (alteration adopted) (quoting *United States v. Fernandez*, 443 F.3d 19, 34 (2d Cir. 2006), *abrogated in part on other grounds by*, *Rita v. United States*, 551 U.S. 338, 346 (2007)); *see also United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012) ("The particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge . . . ." (internal quotation marks omitted) (quoting *Fernandez*, 443 F.3d at 32)). "[W]e presume that the sentencing judge has considered all relevant section 3553(a) factors and arguments unless the record suggests otherwise." *United States v. Williams*, 102 F.4th 618, 623 (2d Cir. 2024) (alteration adopted) (quoting *United States v. Smith*, 982 F.3d 106, 111 (2d Cir. 2020)).

In addition, a district court "has broad discretion 'as to what types of procedures are needed' at a sentencing proceeding for determination of relevant disputed facts," and its discretion "is similarly broad 'either as to the kind of information it may consider, or the source from which it may come.'" *United States v. Duverge Perez*, 295 F.3d 249, 254 (2d Cir. 2002) (alteration adopted) (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996); then quoting *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). We review those determinations for abuse of discretion. *Id.*

We review for "plain error" challenges to sentencing decisions that a defendant did not raise at sentencing. *Hunt*, 82 F.4th at 142 (citing *United States v. Villafuerte*, 502 F.3d 204, 207 (2d Cir. 2007)).

2. *Application*

a. Medical Needs

Guldi first argues that the district court failed adequately to account for his medical needs at sentencing, and instead uncritically accepted the government's representations that the BOP was equipped to meet those needs. Guldi's argument is contrary to the record of his sentencing, which shows that the district court exercised sound discretion in weighing competing considerations.

29

Guldi requested a "nonincarceratory sentence" based on his age and health concerns, including prostate cancer, which required radiation and possibly chemotherapy. App'x at 392–408. The government noted that BOP "has medical facilities and inmates have cancer and undergo radiation and various treatments." *Id.* at 395–96. But Guldi responded that the primary BOP medical facility, located in North Carolina, was "horrific" and was "being sued for lack of care." *Id.* at 401–02. The district court ultimately imposed a below-Guidelines sentence of 36 months' imprisonment, balancing its consideration of Guldi's physical condition with the other Section 3553(a) factors, including the seriousness of the offense and the need for deterrence. The court explained: "I think Mr. Guldi deserves a time in confinement, I probably would have, if he were healthy, given him more than 36 months. But it's hard for me to go below it. I think the crime was a very serious one." *Id.* at 397; *see also id.* at 410–11.

As an initial matter, Guldi did not object to the procedures used to resolve any purported factual disputes at sentencing. Even if he had objected, the district court was not required to "hold a full-blown evidentiary hearing." *Slevin*, 106 F.3d at 1091. "All that is required is that the court 'afford the defendant some opportunity to rebut the Government's allegations.'" *Id.* (quoting *United States v.*

30

*Eisen*, 974 F.2d 246, 269 (2d Cir. 1992)).  Guldi had ample opportunity to do so both in writing and at his sentencing.

Further, the district court did not reflexively accept the government's claim that the BOP could treat Guldi without issue.  The district court noted "great concern" about Guldi's medical needs and about whether imprisonment was "consistent with letting Mr. Guldi continue his radiation therapy and his chemotherapy."  App'x at 395, 398.  When the government's initial response was unsatisfactory, the district court pressed on whether the BOP could accommodate the "delicate balancing" and "constant adjustment" required for radiation and chemotherapy, which made it "very hard to have a confined person be running back and forth to get these treatments."  App'x at 395.  The court seriously considered options for confinement in Guldi's home rather than prison, but rejected them as inconsistent with other goals of sentencing.  *Id.* at 396–99.  And the court credited Guldi's claims about the deficiencies of the main BOP medical facility and recommended Guldi be designated to a different one, though BOP did not act on that recommendation.  *Id.* at 408, 410–11, 419.

In sum, the district court did not make an erroneous factual finding, that Guldi's medical needs would be met in prison without difficulty, based only on

the government's say-so. On the contrary, the district court credited Guldi's argument that his age and medical needs would make incarceration more punishing for Guldi than for a typical defendant and accounted for that in deciding on his ultimate sentence. The "particular weight" to afford each Section 3553(a) factor is a matter "firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289 (internal quotation marks omitted). The district court's careful resolution of this difficult issue at sentencing does not constitute an abuse of discretion.[3]

### b. "Sophisticated Means" Enhancement

Finally, we agree with Guldi's argument that the district court erred in applying the "sophisticated means" enhancement because he was convicted of a simple fraud. Since we cannot find that this error was harmless, Guldi's sentence was procedurally unreasonable and must be vacated for resentencing.

The Sentencing Guidelines provide for a two-offense-level enhancement when "the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."

---

[3] However, we express no view on whether Guldi's medical needs, and the BOP's ability or inability to meet those needs, might give rise to a claim for compassionate release if Guldi remains incarcerated following resentencing, 18 U.S.C. § 3582(c), nor whether the actual conditions of Guldi's confinement are consistent with the Eighth Amendment.

U.S.S.G. § 2B1.1(b)(10)(C). The application note to that Guideline defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 app. n.9(B). The application note elaborates:

> For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

*Id.* "[T]he examples are by their own terms simply illustrative, not exclusive," *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996), but they offer an indication of the level of sophistication that is required to warrant a sentencing enhancement.

We find no clear error in the district court's factual findings that Guldi employed two tactics to conceal his fraud: (1) using cashier's checks to move funds out of the account to which Ditech sent the wire, and (2) avoiding transactions of $10,000 or more to avoid triggering bank reporting requirements. App'x at 377–78. However, for the reasons below, we conclude that the district court erred as a matter of law because Guldi's two relatively unsophisticated tactics, in combination, do not add up to "sophisticated means" warranting a harsher sentence than a garden-variety fraud.

33

First, there is nothing sophisticated about moving money out of one's bank account soon after receiving a fraudulently induced transfer. Even an unsophisticated fraudster knows that account is the first place anyone would look to recover the money and can easily move it. Guldi's suggestion to use cashier's checks, rather than withdrawing thousands of dollars in cash, does not transform this obvious move into a ruse worthy of an enhanced sentence.

Second, structuring transactions to avoid the $10,000 reporting threshold also does not require any particular sophistication. *Cf.* U.S.S.G. § 2B1.1 app. n.9(B). The $10,000 reporting threshold has been common knowledge for more than fifty years. *See, e.g.*, Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912, 6913 (Apr. 5, 1972) (codified at 31 C.F.R. pt. 103). Criminals have been trying to avoid triggering reporting for so long that Congress made structuring a separate crime almost forty years ago. *See* Money Laundering Control Act of 1986, Pub. L. No. 99-570, § 1354, 100 Stat. 3207-18, 3207–22 (1986). And structuring is easy for anyone to execute. If someone thinks structuring might help conceal their crime, it is often as simple as making two withdrawals instead of one. Unlike, for example, creating "fictitious entities, corporate shells, or offshore financial accounts," U.S.S.G. § 2B1.1 app. n.9(B), structuring does not

require any particular skill, knowledge, planning, or coordination. Accordingly, it does not turn a simple fraud into an especially "sophisticated" one.

To be sure, "[w]e have recognized that . . . tactics to conceal offense conduct[] are indicia of the sophistication of an offense." *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014). And we have acknowledged that an offense may be sophisticated "even if each step in the scheme was not elaborate," if "the total scheme was sophisticated in the way all the steps were linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2003). But we have never said *every* multi-step effort to conceal an offense warrants an enhancement. Such a rule would be flatly inconsistent with the Guidelines, which tell us that the enhancement is warranted only for "especially complex or especially intricate" conduct. U.S.S.G. § 2B1.1 app. n.9(B).

Further, no precedent suggests that the "sophisticated means" enhancement is appropriate in this case. This Court has never, in a published or unpublished decision, applied the enhancement to a scheme this simple.[4] The dissenting

---

[4] *Cf. Fofanah*, 765 F.3d at 146–47 (applying enhancement where defendant, among other things, displayed a "sophisticated knowledge of the respective means of shipping stolen cars to different African countries," and engaged in "repetitive and coordinated" conduct to "mov[e] the cars across jurisdictions and then abroad"); *United States v. Amico*, 416 F.3d 163, 169–70 (2d Cir. 2005) (applying enhancement to offense that involved "the creation of false bank documents; the solicitation and creation of false appraisals; the creation of false blueprints; submission of false blueprints to town officials in order to inflate the assessment of

35

opinion suggests that our decision is contrary to some non-precedential and out-of-circuit "sophisticated means" cases that have involved cashier's checks or structuring as one piece of a much larger puzzle, but those cases generally involved far more complex and sophisticated overall schemes than Guldi's.[5] As

comparable home values; collusion with the attorney representing many of the purchasers at closing; and other tactics designed to conceal the scheme"); *Jackson*, 346 F.3d at 25 (applying enhancement based on defendant's "use of hotels and courier services to take delivery of fraudulently obtained goods, his use of prepaid phone cards to prevent tracking of his activities, and his manipulations of victims' credit lines and billing addresses" to defraud numerous distinct victims); *cf. also, e.g.*, *United States v. Elia*, 392 F. App'x 883, 886 (2d Cir. 2010) (summary order) (applying enhancement to "an elaborate combination of means to evade taxes," which included "structuring of investments in multiple deposits to avoid reporting requirements" as just one factor, and also included "the purchase of money orders at multiple locations; . . . the creation of phony loan documents; and numerous cash real estate investments"); *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (summary order) (applying enhancement because "the Defendant's fabrication of sophisticated false documents relating to the status of the funds he took from his victims constituted sophisticated means"); *see also United States v. Valente*, 915 F.3d 916, 920 (2d Cir. 2019) (in another decision arising out of the same prosecution, noting that the defendant created "monthly performance statements that falsely reported gains in various accounts," and "false financial account statements to make it appear as if [his company] was holding the investors' retirement accounts as legitimate IRA accounts").

[5] In *United States v. Snow*, 663 F.3d 1156 (10th Cir. 2011), for example, the court found "Mr. Snow did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions." *Id.* at 1164. While some of the defendant's conduct superficially resembled Guldi's, it also included "providing, and directing others to provide, fraudulent documentation and information sufficient to fool those reviewing it; . . . providing down payments, closing funds, and debt reduction for buyers to qualify for loans; circulating, or instructing his son to circulate, funds through his and his son's business and bank accounts to avoid detection; and teaching a loan originator how to create fictitious second mortgages to help qualify buyers and fool the title and financial institutions involved." *Id.* In *United States v. Kennedy*, 714 F.3d 951 (6th Cir. 2013), the district court found that "Kennedy was directly involved in wire transactions, preparing various sham legal documents, handling promissory notes, and restructuring deposits to avoid bank-reporting requirements," and "Scarborough solicited numerous investors by the use of promissory notes and based her solicitations on purported interstate real estate transactions," and the Court of Appeals applied clear error review not only to facts but to the ultimate legal determination of whether the facts rose to the level of "sophisticated means," which is contrary to the law of this Circuit. *Id.* at 961. In *United States v. Okeke*, 779 F. App'x 389 (7th Cir. 2019) (non-precedential disposition), relied upon by the government, the court recited several "examples of Okeke's sophisticated efforts to evade authorities," including transaction structuring but also "transferr[ing] the money to an offshore account," and "us[ing] his business as a front, lying to bank

far as we can tell, no court has ever watered down the "sophisticated means" enhancement to the degree that would be required to apply it to Guldi. Considering Guldi's conduct in its entirety, applying the enhancement here went a step further than the Guidelines allow.

We also conclude that the district court's procedural error in applying the enhancement was not harmless, and the government does not argue otherwise. *Cf. United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014) ("If we 'identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing.'" (quoting *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009))). The district court accepted the government's recommendation of a modestly below-Guidelines sentence based on Guldi's serious medical needs, discussed above, which the district court also found compelling. Spec. App'x at 61, 75–76. While the district court made clear it thought some term of incarceration was

---

officials that the suspicious transactions were car sales," two of the specific examples given in the application note. *Id.* at 392. And *United States v. Clements*, 73 F.3d 1330 (5th Cir. 1996), is inapposite both because it involved a different Guideline that is specific to tax cases, U.S.S.G. § 2T1.1, and because the court applied "clear error" review to the ultimate application of the Guidelines in addition to the underlying facts. *Id.* at 1340.

appropriate, given the seriousness of Guldi's offense, the court's explanation of its reasons for selecting 36 months does not make "clear that the judge based the sentence . . . on factors independent of the guidelines." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). On the contrary, it is at least plausible that, on resentencing with a lower Guidelines range, the district court will find that a shorter term of incarceration will meet the goals of sentencing. Accordingly, we vacate Guldi's sentence and remand for resentencing.

### III. CONCLUSION

We have considered the remainder of Guldi's arguments and find them to lack merit. For these reasons, we **AFFIRM** the judgment of the district court except as to Guldi's sentence, which we **VACATE** and **REMAND** for resentencing consistent with this opinion.

PARK, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority except for its conclusion that the district court erred in applying the sophisticated-means enhancement. Defendant George Guldi, a former Suffolk County legislator and disbarred real-estate attorney, worked with co-conspirator Victoria Davidson to trick a mortgage servicer into wiring $253,236 to Davidson's personal bank account. Once Davidson received the money, Guldi coached her to use cashier's checks in order to prevent the loan servicer from reclaiming the funds and to avoid transactions over $10,000 in order to evade bank-reporting requirements. That is enough to constitute sophisticated means.

"[T]actics to conceal offense conduct[] are indicia of the sophistication of an offense." *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014); *see also United States v. Amico*, 416 F.3d 163, 170 (2d Cir. 2005) (affirming an application of the enhancement where defendant "recommended strategies . . . to reduce the likelihood that lenders would . . . discover the fraud"); *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) (same where defendant "prevent[ed] tracking of his activities," even though "each step in the scheme was not elaborate" in isolation).[1]

---

[1] *See also United States v. Elia*, 392 F. App'x 883, 886 (2d Cir. 2010) (affirming an application of the enhancement where defendant took steps to "avoid reporting requirements"); *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (same for defendant's "fabrication of sophisticated false documents," though defendant argued that the creation of false documents was not "especially complex or especially intricate" (quotation marks omitted)).

The majority cites no case in which a court has said that conduct like Guldi's does not warrant the enhancement.  Indeed, our sister circuits have held that using cashier's checks to obscure the movement of funds constitutes sophisticated means.  *See, e.g.*, *United States v. Snow*, 663 F.3d 1156, 1164 (10th Cir. 2011); *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996).  Similarly, we and other courts have found transactions structured to avoid banking requirements to be sophisticated.  *See, e.g.*, *United States v. Bailey*, 820 F. App'x 57, 62 (2d Cir. 2020); *Elia*, 392 F. App'x at 886; *United States v. Kennedy*, 714 F.3d 951, 961 (6th Cir. 2013); *Snow*, 663 F.3d at 1164.  The majority's conclusion is contrary to the weight of authority.

We have never required a defendant's actions to be beyond the capability of an ordinary person or based on "particular skill, knowledge, planning, or coordination."  *Ante* at 35.  In fact, in *Jackson*, we rejected the argument that sophisticated means requires "inside information" or "special technology."  346 F.3d at 25 (quotation marks omitted).  Moreover, it is not relevant whether the $10,000 reporting threshold is "common knowledge."  *Ante* at 34;  *see United States v. Loles*, 628 F. App'x 7, 9-10 (2d Cir. 2015) (rejecting defendant's argument that the enhancement should not apply because he employed means "commonplace in similar fraudulent schemes"); *United States v. Ojemen*, 465 F. App'x. 69, 72 (2d Cir. 2012) (explaining that a "scheme as a whole" was sophisticated even though defendant argued "that he engaged only in garden variety fraud by filling out various forms inaccurately").  The question is not whether a defendant's conduct required particular skill, but whether the scheme in its totality was especially complex.  *See United States v. Lewis*, 93

2

F.3d 1075, 1083 (2d Cir. 1996) (affirming an application of the enhancement even though "each step . . . was simple").

The majority observes that Guldi did not use means like "fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1 app. n.9(B) (noting that such conduct "ordinarily indicates sophisticated means"). But the Guidelines do not say that the absence of such conduct indicates lack of sophistication. *See Lewis*, 93 F.3d at 1082 ("While their absence might mean that the case cannot be disposed of by reference to one of the examples specifically enumerated in the commentary, the examples are by their own terms simply illustrative, not exclusive."). The same application note states that "in a telemarketing scheme," for example, "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 app. n.9(B). Such conduct is no more complex than Guldi's.

Finally, the majority fails to afford the requisite deference to the district court. Whether the sophisticated-means enhancement applies is a fact-intensive inquiry. Here, the district court found after a two-week trial that Guldi was involved in "setting up" Davidson "to pretend that she could have access to the account" and "playing bank rules off one against the other and breaking up the check[s] in various amounts." App'x at 378. In my view, the district court's application of the enhancement on those facts was reasonable. *See Gall v. United States*, 552 U.S. 38, 46 (2007).

I respectfully concur in part and dissent in part.

3